United States District Court
District of Massachusetts

```
_____
                                )
KONINKLIJKE PHILIPS N.V. and     )
PHILIPS ELECTRONICS NORTH        )
AMERICA CORPORATION,             )
                                 )
        Plaintiffs/              )
        Counter-Defendants,      )    Civil Action No.
                                 )    10-11041-NMG
        v.                       )
                                 )
ZOLL MEDICAL CORPORATION,        )
                                 )
        Defendant/               )
        Counter-Claimant.        )
_____ )
```

### MEMORANDUM & ORDER

GORTON, J.

In this patent action, plaintiffs/counter-defendants Philips Electronics North America Corporation and Koninklijke Philips, N.V. (collectively, "Philips") and defendant/counter-claimant ZOLL Medical Corporation ("ZOLL") present cross claims of patent infringement and patent invalidity. ZOLL also contends that 1) the equitable defense of laches bars Philips from recovering any pre-filing damages and 2) Philips is equitably estopped from obtaining any relief on its infringement claims with respect to its "waveform" patents.

In December, 2013, the Court considered evidence on laches and equitable estoppel in conjunction with the 12-day jury trial on infringement and invalidity. The Court now publishes its

findings of fact and conclusions of law as to those issues pursuant to Fed. R. Civ. P. 52(a).

# I. Findings of Fact

## A. Philips' Asserted Patents

### 1. The Waveform Patents

1. Four of the seven patents asserted by Philips in the December 2013 trial are directed to biphasic waveforms in defibrillators and their associated circuitry. Those patents (collectively the "waveform patents") are:

- U.S. Patent No. 5,607,454 ("the '454 patent) which issued on March 4, 1997;

- U.S. Patent No. 5,749,905 ("the '905 patent") which issued on May 12, 1998;

- U.S. Patent No. 5,836,978 ("the '978 patent") which issued on November 17, 1998; and

- U.S. Patent No. 6,047,212 ("the '212 patent") which issued on April 4, 2000.

2. Philips asserted claims of the '454, '905 and '978 patents against six ZOLL products: the AED Plus, the AED Pro, the M Series, the E Series, the R Series and the X Series defibrillators. Philips also asserted claims of the '212 patent against four ZOLL products: the AED Plus, the AED Pro, the R Series and the X Series.

3. Claim 15 of the '454 patent, which was asserted against ZOLL at trial, claims a method for applying electrotherapy comprised of several steps including "monitoring an electrical parameter during the discharging step" and "removing the additional impedance from the electrical circuit if the electrical parameter is within a defined range prior to the end of the discharging step."

4. Claim 4 of the '905 patent, which was asserted against ZOLL at trial, claims a method for delivering electrotherapy that includes "monitoring a patient-dependent electrical parameter during the discharging step".

5. Claims 4 and 5 of the '978 patent, which were asserted against ZOLL at trial, claim a method for applying electrotherapy that includes "simultaneously monitoring a patient-dependent electrical parameter and time during the discharging step".

## 2. The Self-Test Patents

6. Two of the patents asserted by Philips at trial are directed to certain self-testing methods and apparatus. Those patents (collectively the "self-test patents") are:

- U.S. Patent No. 5,800,460 ("the '460 patent") which issued on September 1, 1998; and

- U.S. Patent No. 5,879,374 ("the '374 patent") which issued on March 9, 1999).

-3-

7.    Philips asserted claims of the '374 patent against six ZOLL products: the AED Plus, the AED Pro, the M Series, the E Series, the R Series and the X Series defibrillators.  Philips also asserted claims of the '460 patent against two ZOLL products: the AED Plus and AED Pro.

### 3.    The CPR Instructions Patent

8.    U.S. Patent No. 6,356,785 ("the '785 patent") issued on March 12, 2002 and is directed to prompts for using and operating automated external defibrillators ("AEDs").

9.    Philips asserted claims of the '785 patent against four ZOLL products: the AED Plus, the AED Pro, the E Series and the X Series.

### B.    ZOLL's Accused Products

10.    ZOLL entered the public-access AED market in 2000 but began to market professional defibrillators that included an AED mode as early as 1994.

11.    ZOLL began selling the M Series in 1999, the AED Plus in February, 2002, the AED Pro in December, 2004, the E Series in June, 2005, the R Series in December, 2006 and the X Series in September, 2011.

### C.    Background on Parties and Witnesses

12.    Heartstream Inc., a predecessor to Philips, was founded in 1992 and was acquired by Hewlett Packard Inc. in 1998.  In 1999, Hewlett Packard created a new subsidiary called

Agilent Technologies ("Agilent") which included the former Heartstream unit.  Koninklijke Philips Electronics, N.V. acquired Agilent in 2001.[1]

13.   Deborah DiSanzo became the General Manager of Heartstream Inc. in May, 1998, directed the defibrillator business at Agilent from 1999 to 2001 and was the General Manager of Philips' cardiac resuscitation business from about the time Philips acquired Agilent in 2001 until 2006.

14.   Richard Packer, the President and CEO of ZOLL, testified at trial that he and Ms. DiSanzo met in the late 1990s, saw each other at industry events over the years and sat on an industry group board together.  Mr. Packer and Ms. DiSanzo discussed patents and intellectual property in general but, prior to 2008, never talked about whether ZOLL was infringing Philips' patents.

15.   Shervin Ayati, a former ZOLL product manager, supervised the technical development of ZOLL's rectilinear biphasic waveform in the 1990s.  While at ZOLL, Mr. Ayati co-authored two peer-reviewed journal articles about ZOLL's biphasic waveform that were published in 1999 and 2000 and was named as co-inventor on six patents directed to biphasic

---

[1] To avoid confusion, the Court will henceforth refer to all of these entities as "Philips".

waveform technology.  Mr. Ayati was hired by Ms. DiSanzo in 2001 to help develop the hospital defibrillator business of Philips.

16.  Gary Freeman, the Vice President of Technology at ZOLL, was a member of a committee assembled to promote biphasic waveform technology in the 1990s.  Carl Morgan, who is a named inventor on several of the Philips waveform and self-test patents, was also a member of the same committee.  Mr. Freeman and Mr. Morgan saw each other at conferences regularly.

**D.   ZOLL's Technology**

   **1.   ZOLL's Biphasic Waveform**

17.  ZOLL owns seven patents related to biphasic waveform technology.  All seven issued between March, 1998 and August, 2000 and were publicly available in August, 2000.  Shervin Ayati and Michael Lopin are named as co-inventors on all seven patents.  Figure 1 of each of the patents discloses ZOLL's rectilinear biphasic waveform.  Each of the patents also discloses that

> In preferred embodiments the control circuit decides, based on the patient impedance sensed during an initial sensing pulse portion of the discharge of the charge storage device, how many (if any) resistors to include in the defibrillation path at the beginning of a therapeutic discharge ....

> Thus, immediately after the sensing pulse, the biphasic defibrillation waveform has an initial discharge current that is controlled by microprocessor 46 based on the patient impedance sensed by current-sensing transformer 64.

14.  ZOLL's biphasic waveform was described in two published peer-reviewed articles which presented the results of clinical studies demonstrating the superior efficacy of ZOLL's waveform over the then-standard monophasic waveform.  The first article, which was published in 1999 in the Journal of the American College of Cardiology, described ZOLL's waveform as including the following feature:

> For biphasic shocks, a constant-current first phase
> was maintained by automatically adjusting the variable
> internal impedance based on the patient's
> transthoracic impedance, which was determined at the
> onset of shock delivery.

The second article, published in 2000 in Circulation, included a nearly identical passage.

18.  In 1999, Philips, ZOLL and two other companies formed an industry consortium to promote the use of biphasic waveform technology.  During the course of that collaboration, representatives of Philips and ZOLL discussed how their respective waveforms worked in order to make sure that they could come up with a consensus statement that worked for all four companies.  The consortium released an unsigned "Industry Consensus Statement" on low energy biphasic defibrillation in September, 2000 that cited the two articles co-authored by Mr. Ayati.

19.  On January 25, 1999, ZOLL announced in a press release that it continued to make progress with its "clinically

advanced, patented biphasic waveform" and that it expected to launch biphasic technology in 1999. On that same date, individuals at Philips, including Ms. DiSanzo, received a copy of the press release in an email sent by a Philips colleague titled "Zoll Medical - First Quarter results" noting that ZOLL expected to launch biphasic technology in 1999.

20. On March 8, 1999, ZOLL announced in a press release that it had successfully completed clinical studies of its rectilinear biphasic waveform. The press release was included as an attachment in an email sent to individuals at Philips, including Ms. DiSanzo. The email was titled "Zoll biphasic study news" and stated

> FYI, I saw the attached news today about Zoll's biphasic waveform study. Brad [a Philips engineer] is undoubtedly hearing more about this at ACC [a trade show].

21. On September 9, 1999, ZOLL announced in a press release that it had received FDA approval for its patented biphasic waveform technology. The press release explained that the waveform's

> constant current first phase eliminates the high peak current levels that are a hallmark of early generation Biphasics [and that a study] showed superior efficacy for patients with high transthoracic impedance.

The text of the press release was included in the body of an email titled "Sept 9, Zoll gets FDA Clearance of Biphasic for M-Series" sent by a Philips employee to individuals at Philips,

including Ms. DiSanzo.  There was no text in the email other than the press release.

22.  On November 2, 2000, ZOLL announced in a press release that it had licensed its biphasic waveform to GE Medical Systems and that

> ZOLL's patented technology employs a fixed duration, constant current design that eliminates high peak currents, and controls patient impedance.

It was forwarded by a Philips employee to Ms. DiSanzo in an email titled "FW: News re: Medtronic/Siemens & Zoll/GE".

23.  Mr. Packer testified that ZOLL's sales force "widely distributed" a marketing brochure to customers that described ZOLL's rectilinear biphasic waveform in detail and cited ZOLL's patents and the two articles described in Finding 14 above.

24.  Since at least 2001, Philips has gathered competitive intelligence about ZOLL's technology from its displays at trade shows.  In March, 2001, employees of Philips visited ZOLL's booth at the American College of Cardiology trade show and one reported in an email to Philips employees, including Ms. DiSanzo, that ZOLL's "marketing message was all around their biphasic technology."  In November, 2001, Philips employees inspected ZOLL's recently-developed AED Plus at an American Heart Association trade show and several reported their findings on ZOLL's AED Plus and two products produced by a competitor,

Access Cardio, in emails on which Ms. DiSanzo and Mr. Ayati were carbon-copied.

25. In March, 2002, ZOLL announced in a press release that the Food and Drug Administration ("FDA") had approved its AED Plus defibrillator which

> incorporates ZOLL's proprietary Rectilinear Biphasic(TM) waveform, the only biphasic waveform the FDA has cleared and labeled as clinically superior to monophasic defibrillators for conversion of ventricular fibrillation in high-impedance patients and for cardioversion of atrial fibrillation.

The press release was attached to an email titled "ZOLL NEWS" that was sent to Ms. DiSanzo and other Philips employees.

26. At some point in or before July, 2009, Philips discovered that ZOLL's website stated that ZOLL's waveform patents employed an impedance compensation technique during a "shock delivery". There was no evidence presented at trial as to the precise date on which that information appeared on ZOLL's website or when Philips discovered it. ZOLL later removed that statement from its website and replaced it with a statement declaring that the impedance compensation technique is employed during a "test pulse".

### 2. ZOLL's CPR Instructions Technology

27. The March, 2002 ZOLL press release also indicated that the AED Plus featured a "combination of simple, step-by-step illustrations and audio coaching". The press release was

-10-

attached to an email titled "ZOLL NEWS" that was sent to Ms. DiSanzo and other Philips employees.

28.   At some point, an employee of Philips downloaded a copy of the AED Plus Administrators Guide from ZOLL's website and attached it to an email to several Philips employees, including Ms. DiSanzo, in June, 2002.  The Administrators Guide included specifications and instructions for operating the AED Plus.

29.   The AED Plus issues voice prompts as soon as it is turned on which would have been self-evident to anyone who examined the device.

### 3.    ZOLL's Self-Test Technology

30.   The Administrators Guide for the AED Plus describes its self-test features.  A Philips employee downloaded that Guide from ZOLL's website and emailed it to Philips employees, including Ms. DiSanzo, in June, 2002.

31.   The self-test display is located on the front of the AED Plus device.

### E.    Philips' Delay in Filing Suit

32.   Philips sued Defibtech LLC for patent infringement in the early 2000s.  A user manual for one of Defibtech's products admitted that it utilized Hewlett Packard's (i.e. Philips') technology.

33.  Philips also brought a patent infringement action against Access CardioSystems, Inc. in the 2000s.  That company explicitly marketed its products as providing a cheaper version of Philips' waveform technology.

34.  Access Cardio and Defibtech were major, established competitors of Philips before ZOLL began to compete for market share.

35.  Philips was also involved in litigation with Cardiac Science Inc. during the same time period.  Cardiac Science sued Philips for patent infringement and Philips counterclaimed for infringement of its self-test patents.  Cardiac Science was one of Philips main competitors with respect to self-testing technology.

36.  Mr. Packer was aware of Philips' three lawsuits and believed that Philips had a business strategy of enforcing its intellectual property rights against other companies.

**F.    Initiation of Instant Suit**

37.  In November, 2008, counsel for Philips sent a cease and desist letter to ZOLL claiming that ZOLL infringed Philips' asserted patents.  That was the first time that Philips contacted ZOLL with respect to the patents at issue.

38.  The parties made a good faith effort to negotiate the settlement of the alleged infringement between 2008 and 2010.

39.  Philips filed the instant action on June 18, 2010.

**G.   Evidence of Prejudice**

40.   In 1992, sales of ZOLL's products accounted for approximately 15% of the market for defibrillators used in hospitals.  By the time this action went to trial, ZOLL's market share had grown to 50%.

41.   ZOLL did not alter the design of any of the accused products for more than five years after receiving the cease and desist letter from Philips in 2008.  In 2013, ZOLL implemented a technique in its X-Series defibrillator for using a high-frequency, low-current signal that measures impedance without using any energy discharge from the capacitor.  ZOLL had been aware of that technology as early as 1999 and could have implemented it earlier.

42.   Philips did not assert the '212 waveform patent against ZOLL's M-Series and E-Series defibrillators.  The M-Series and E-Series defibrillators both use a four-switch circuit configuration rather than the five-switch configuration required by Philips' asserted claims.

43.   Although a Nihon Koden employee testified that a pre-1993 Nihon Koden manual contained the same description of the self-test features that was included in the 1994 manual introduced at trial, there is no evidence that ZOLL could have

obtained the pre-1993 version of the manual had it been sued earlier.

## II.  Conclusions of Law

### A.  Laches

#### 1.  Legal Standard

Laches is an equitable defense that may bar a party from relief if its delay in bringing the claim was 1) unreasonable and inexcusable from the time when the plaintiff had actual or constructive notice of its potential claim and 2) resulted in injury or prejudice to the opposing party. A.C. Aukerman Co. v. R.L. Chaides Constr. Co., 960 F.2d 1020, 1034–35 (Fed. Cir. 1992) (en banc).  Both elements may be presumed when the patentee delays filing suit for more than six years after it has actual or constructive knowledge of the defendant's potentially infringing activities. Id. at 1035–36.  The laches clock does not begin to run, however, until the patentee has actual or constructive knowledge of "an act of infringement that gives rise to a legal claim." Intirtool, Ltd. v. Texar Corp., 369 F.3d 1289, 1297–98 (Fed. Cir. 2004).

The standard for actual knowledge is whether the patentee had knowledge of the activity alleged to infringe, i.e. the salient features of the accused product or method. Aukerman, 960 F.2d at 1035–36.

Constructive knowledge, on the other hand, exists if the patentee should have known about the infringement because "the facts already known by him were such as to put upon a man of ordinary intelligence the duty of inquiry." Wanlass v. Gen. Elec. Co., 148 F.3d 1334, 1338 (Fed. Cir. 1998) (quoting Johnston v. Standard Min. Co., 148 U.S. 360, 370 (1893)).  For example, constructive knowledge exists if the accused infringer is found to have engaged in

> pervasive, open, and notorious activities that a
> reasonable patentee would suspect were infringing
> [such as an infringer's] [s]ales, marketing,
> publication, or public use of a product similar to or
> embodying technology similar to the patented
> invention, or published descriptions of the
> [infringer's] potentially infringing activities.

Id. (citations omitted).  Moreover, constructive knowledge may be imputed to the patentee where such activities are "sufficiently prevalent in the inventor's field of endeavor." Id.  Thus, a patentee who is negligently or willfully oblivious to such activities cannot escape the application of laches based upon the lack of actual notice to its representatives. Id.

The presumption of laches is a "bursting bubble" presumption that disappears if the patentee is able to establish a genuine issue as to whether 1) it delayed for more than six years after acquiring actual or constructive knowledge, 2) its delay was justified or 3) the infringer did not suffer any

additional prejudice during the six year time period. Aukerman, 960 F.2d at 1037-38.

Even if the presumption is rebutted, unreasonable delay and prejudice may still bar a plaintiff's claim. Id. at 1038. "The length of time which may be deemed unreasonable has no fixed boundaries but rather depends on the circumstances." Id. at 1032. Moreover, a court must consider whether the delay was justified by, for instance, ongoing litigation or negotiations with the accused infringer. Id. at 1033 (collecting cases).

Prejudice may be evidentiary or economic. The Federal Circuit has acknowledged that economic prejudice is a "slippery issue to resolve" because it is difficult to draw a line between losses due to the finding of infringement and losses that could have been prevented had the patentee not delayed in filing suit. Id. Economic prejudice may arise where the infringer will lose investments or incur damages that would likely have been prevented if the patentee had filed its suit earlier. Id. While the Federal Circuit has not required a showing of increased capital investment to prove economic prejudice, it does require a defendant to show, at the very least, that it increased its expenditures, i.e. it spent more on marketing or development, as a result of the plaintiff's delay in filing suit. See Hearing Components, Inc. v. Shure Inc., 600 F.3d 1357, 1376 (Fed. Cir.

2010) (citing <u>ABB Robotics, Inc.</u> v. <u>GMFanuc Robotics Corp.</u>, 52 F.3d 1062, 1065 (Fed. Cir. 1995)).

Economic prejudice does not include monetary losses due to liability for infringement because, were that the case, economic prejudice would be a factor in every suit. <u>Aukerman</u>, 960 F.2d at 1033.  Still, a patentee may not "intentionally lie silently in wait watching damages escalate" particularly when the infringer could have switched to a non-infringing product if it had notice. <u>See</u> <u>id</u>.

In evaluating where to draw the line between economic prejudice and normal business expenditures, courts, including the Federal Circuit, generally find evidence of the accused infringer's conduct upon being sued or notified of possible infringement persuasive.  The fact that an accused infringer continues to engage in the allegedly infringing activity may indicate that it would not have changed its behavior if it had been sued earlier. <u>See</u> <u>State Contracting & Eng'g Corp.</u> v. <u>Condotte Am., Inc.</u>, 346 F.3d 1057, 1066-67 (Fed. Cir. 2003). Similarly, a court may infer that an accused infringer who maintains that the subject patent is invalid and non-infringed throughout litigation would have been unlikely to change its conduct if it had learned of infringement earlier given that it did not believe that it was liable. <u>Ecolab, Inc.</u> v. <u>Envirochem, Inc.</u>, 264 F.3d 1358, 1372 (Fed. Cir. 2001).

Evidentiary prejudice may arise if the defendant cannot present a "full and fair defense on the merits" due to factors such as lost records, the death of a witness or the "unreliability of memories of long past events" that undermine the ability of the court or jury to judge the facts. <u>Aukerman</u>, 960 F.2d at 1033 (citations omitted).

The accused infringer has the burden of proving the facts related to laches, including delay and prejudice, by a preponderance of the evidence. <u>Id.</u> at 1045.

Finally, laches is not applied mechanically.  Rather,

> laches is not <u>established</u> by undue delay and prejudice.  Those factors merely lay the foundation for the trial court's exercise of discretion.  When there is evidence of other factors which would make it inequitable to recognize the defense despite undue delay and prejudice, the defense may be denied.

<u>Id.</u> at 1036.

### 2.  Application

The Court hereby makes the following conclusions of law with respect to ZOLL's laches defense:

### a.  Knowledge of Infringement

### i.  Waveform Patents

44.  ZOLL has not proved that Philips had actual knowledge of infringement of the waveform patents prior to 2008 when someone at Philips allegedly noticed language on ZOLL's website.

45.  ZOLL has also not proved, by a preponderance of the
evidence, that Philips had constructive knowledge of its
infringement.  While ZOLL is correct that Philips employees,
including its General Manager, received materials that mentioned
ZOLL's biphasic waveform technology, and several of those
materials mentioned impedance, none of the subject press
releases described the relevant technology with sufficient
specificity to put Philips on notice of an "act of infringement
that gives rise to a legal claim." Intirtool, 369 F.3d at 1297-
98.  Moreover, the two peer-reviewed articles which briefly
described ZOLL's technology mentioned only that the technology
adjusts impedance at the "onset of shock delivery" unlike the
asserted patents which (with the exception of the '212 patent)
claim a method of electrotherapy in which impedance is adjusted
during "the discharging step", i.e. shock delivery.  The Court
concludes that such information would not create a reasonable
suspicion that the waveform patents were infringed by ZOLL. See
Wanlass v. Fedders Corp., 145 F.3d 1461, 1466 (Fed. Cir. 1998)
(explaining that advertisements that described a similar product
with specific characteristics would be sufficient to alert the
patentee to possible infringement); Carnegie Mellon Univ. v.
Marvell Tech. Grp., Ltd., No. 09-290, 2014 WL 183212, at *19
(W.D. Pa. Jan. 14, 2014) (collecting cases that stand for the

proposition that a reasonable suspicion of infringement creates a duty of inquiry).

46. Even if the articles, press releases and other materials were sufficient to put Philips on constructive notice and create a duty to investigate because they, at the very least, informed Philips that ZOLL was using "similar technology to accomplish a similar objective" as the asserted patents, see id., ZOLL presented no evidence that Philips would have been able to determine infringement by examining the accused products or by obtaining other information that was available to the public at the time. Cf. PSN Ill., Inc. v. Ivoclar Vivadent, Inc., 398 F. Supp. 2d 902, 910 (N.D. Ill. 2005) (explaining that composition of allegedly infringing ingot was difficult to discern and raised questions at the summary judgment stage as to whether the alleged infringement was "open" and "notorious").

### ii. CPR Instructions Patent

50. Philips had constructive knowledge of infringement of the '785 patent by ZOLL's AED Plus as of June, 2002. By that time, employees, including Ms. DiSanzo, had received 1) a copy of a ZOLL press release that described how ZOLL's AED Plus included a "combination of simple, step-by-step illustrations and audio coaching" and 2) a copy the Administrators Guide for ZOLL's AED Plus. That information was sufficient to create a reasonable suspicion of infringement and an accompanying duty to

investigate.  The existence of voice prompt features would have been self-evident to anyone who examined the device and therefore investigation would have revealed a likelihood of infringement.

### iii. Self-Test Patents

48.  Philips had constructive knowledge of infringement of the '460 and '374 patents as of June, 2002, for the reasons listed above with respect to the '785 patent.

### b.    Presumption of Laches

49.  A bursting bubble presumption of laches arises when a patentee delays filing suit for six or more years after it develops actual or constructive knowledge of the alleged infringement. Id. at 1036-37.

50.  The Court will not penalize Philips for the time spent negotiating with ZOLL between November, 2008, when Philips informed ZOLL of possible infringement, and June, 2010, when Philips filed the instant lawsuit. Aukerman, 960 F.2d at 1033. As a result, it considers the relevant time period for laches to expire in November, 2008.

51.  Philips had constructive knowledge of infringement of the '785, '374 and '460 patents as of June, 2002.  As a result, a presumption of laches arises as to those patents because Philips delayed six years and five months before filing suit.

52.  If the Court were to conclude that Philips had constructive notice of infringement of the '454, '905, '978 and '212 patents earlier than 2008, it would deem the date on which Philips developed constructive knowledge to be March, 2002, which is six years and eight months before Philips notified ZOLL of infringement of those patents.

### c.    Reasons for Delay

53.  Philips has, however, defeated any presumption of laches because it has reasonable excuses for its delay in filing suit after it had constructive knowledge of any of the subject devices. Id. at 1037.  It is well established that a patentee is not required to sue all potential infringers at once to avoid a finding of laches. See Hemstreet v. Computer Entry Sys. Corp., 972 F.2d 1290, 1293 (Fed. Cir. 1992).  During the alleged laches period, Philips was engaged in intellectual property litigation with three other competitors.  Ms. DiSanzo's testimony that two of those competitors were "blatantly" infringing Philips's patents was not rebutted or disputed.  The Court concludes that Philips was not required by the doctrine of laches to sue ZOLL concurrently with three other competitors and that it was reasonable for Philips to target more blatant infringers before it sued ZOLL.

54.  While ZOLL is correct that Philips did not notify ZOLL that it was next in line to be sued, the Federal Circuit has not

imposed a rigid notice requirement. Id. (citing Aukerman, 960
F.2d at 1033). Furthermore, Mr. Packer testified that he was
aware that Philips had a strategy of enforcing its intellectual
property portfolio against other companies and therefore was, at
the very least, aware of the ongoing litigation and that, as a
competitor, ZOLL was a potential target for future litigation.

### d. Prejudice

55. ZOLL has not demonstrated, by a preponderance of the
evidence, that it suffered either economic or evidentiary
prejudice as a result of the delay.

56. First, the Court is unconvinced that ZOLL would have
ceased to infringe had Philips brought suit earlier. Throughout
this litigation ZOLL has denied that it infringed the subject
patents and maintained that they were invalid. See Humanscale
Corp. v. CompX Int'l Inc., No. 09-86, 2010 WL 3222411, at *13
(E.D. Va. Aug. 16, 2010). Moreover, ZOLL did not alter the
design of its accused products either in 2008 when it was
informed of possible infringement or when Philips filed suit in
2010 but instead implemented its first change to its waveform
technology in 2013. Furthermore, ZOLL did not present evidence
that has changed the self-test features of its products since
2008. See State Contracting, 346 F.3d at 1066-67. The Court
understands that ZOLL had less of an incentive to adjust a
possibly infringing product when Philips filed suit toward the

-23-

expiration dates of Philips' patents.  Therefore, the fact that
ZOLL did not make changes to its product design immediately is
not dispositive in this case.  The Court accords significantly
more weight to the fact that ZOLL consistently took the position
that the subject patents were invalid and noninfringed.

57.  ZOLL produced evidence at trial that its market share
increased from 15% in 1992 to around 50% in December, 2013.  It
did not, however, show that it made any capital investments or
increased expenditures between 2002 and 2008 such that it can
claim economic prejudice. See Hearing Components, 600 F.3d at
1376.  The Federal Circuit has not required a showing of
increased capital investment but it does require a defendant to
show, at the very least, that it increased its expenditures,
i.e. it spent more on marketing or development, as a result of
the plaintiff's delay in filing suit. See id. (citing ABB
Robotics, 52 F.3d at 1065).  Here, ZOLL failed to show that it
invested in production or that any such investment was made
because of Philips's delay and was not "simply a business
decision to capitalize on a market opportunity." Hemstreet, 972
F.2d at 1294 (citing Aukerman, 960 F.2d at 1033).

58.  The Court is also unpersuaded that ZOLL suffered any
evidentiary prejudice as a result of the delay.  ZOLL failed
conclusively to demonstrate that it would have been able to
obtain a pre-1993 version of the Nihon Koden manual if it had

-24-

been sued earlier. See Hall v. Aqua Queen Mfg., Inc., 93 F.3d

1548, 1557 (Fed. Cir. 1996) (explaining that accused infringer

failed to meet its burden because it did not conclusively

demonstrate that the allegedly prejudicial changes in

circumstance occurred during the laches period).

### B.   Equitable Estoppel

#### 1.   Legal standard

Equitable estoppel is an equitable defense that entirely

bars a claim to infringement. Aukerman, 960 F.2d at 1041.  In

order to establish equitable estoppel in the patent context, an

accused infringer must establish that 1) the patentee

communicates something in a misleading way by words, conduct or

silence that

> supports the inference that the patentee did not
> intend to press an infringement claim against the
> alleged infringer,

2) the infringer's relationship or communication with the

patentee lulls the infringer into a "sense of security" and 3)

the infringer would be materially prejudiced if the patentee is

allowed to proceed with its claims. Id. at 1041-43.

#### 2.   Application

59.  The defense of equitable estoppel does not apply to

the asserted claims of the waveform patents.  There is no

evidence that Philips had a duty to alert ZOLL to its intent to

assert its patents against the accused products and yet remained

silent and, in any event, ZOLL has not established economic or evidentiary prejudice for the reasons outlined above.

**III. <u>Conclusion</u>**

Looking to the totality of evidence presented, the Court concludes that it is inappropriate 1) to limit Philips' damages based upon the doctrine of laches or 2) to bar Philips' claims of infringement of its waveform patents based upon the doctrine of equitable estoppel.

**So ordered.**

/s/ Nathaniel M. Gorton
Nathaniel M. Gorton
United States District Judge

Dated May 16, 2014